## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| **TIGI LINEA CORP.,** | § | |
| **Plaintiff,** | § | |
| | § | **LEAD CASE 4:19-cv-00840-RWS-KPJ** |
| **v.** | § | |
| | § | **CONSOLIDATED CASE 4:20-cv-087** |
| **PROFESSIONAL PRODUCTS GROUP,** | § | |
| **LLC,** | § | |
| | § | |
| **Defendant.** | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court are multiple discovery disputes between the parties. *See* Dkt. 153. On February 11, 2021, Professional Products Group, LLC ("PPG") filed a letter brief (Dkt. 154), which the Court construes as a Motion to Compel ("PPG's Motion to Compel"). TIGI Linea Corporation ("TIGI") filed a response (Dkt. 156), to which PPG filed a reply (Dkt. 159).

TIGI filed a letter brief (Dkt. 155) on a separate discovery issue, which the Court construes as a Motion to Compel ("TIGI's Motion to Compel"). PPG filed a response (Dkt. 157), to which TIGI filed a reply (Dkt. 158).

On March 16, 2021, PPG filed a Motion to Supplement the Record in Support of Motion to Compel ("PPG's Motion to Supplement") (Dkt. 160), to which TIGI filed a response (Dkt. 162).

On April 21, 2021, the Court held a hearing (the "Hearing"), during which it heard oral argument on all three Motions. *See* Dkt. 179. Having considered the arguments and applicable authorities, the Court finds TIGI's Motion to Compel (Dkt. 154) is **GRANTED IN PART** and **DENIED IN PART**; PPG's Motion to Compel (Dkt. 155) is **GRANTED IN PART** and **DENIED IN PART**; and PPG's Motion to Supplement (Dkt. 160) is **GRANTED**.

# I.   BACKGROUND

TIGI manufactures professional hair care, body, and cosmetic products. *See* Dkt. 143 at 2. PPG is a distribution company that distributes professional hair care products from manufacturers directly to retailors, as well as to other distributors and wholesalers. *See* Dkt. 13-1 at 1; Dkt. 143 at 2. From April 1998 to January 2014, Vincent A. Davis ("Davis") worked as a TIGI sales and marketing executive, holding positions such as Senior Vice President of Sales Worldwide and General Manager of the Americas. *See* Dkt. 143 at 2. TIGI alleges in October 2011, Davis executed an Exclusive Supply and Distribution Agreement (the "Exclusive Agreement") on behalf of TIGI with PPG. *Id.* at 5. The Exclusive Agreement purports to grant PPG "an exclusive right to sell TIGI Products to distributors and wholesalers that sell to mass retailers and to sell TIGI Products directly to mass retail stores such as Wal-Mart, club stores, drug store chains, food stores, or wherever professional hair-care products can be found located in North America (the "North American Mass Retail Market")." Dkt. 89-1 at 3. The Exclusive Agreement also provides, "TIGI shall not sell, directly or indirectly, to the North American Mass Retail Market other than to PPG without the prior written approval of PPG." *Id.* Although TIGI alleges the Exclusive Agreement was executed in October 2011, the Agreement states, "This is an agreement effective as of January 1, 2008." Dkt. 89-1 at 1.

TIGI alleges Davis entered into the Exclusive Agreement without obtaining authorization from TIGI's management or any review from TIGI's legal department. *See* Dkt. 143 at 5. TIGI further alleges Davis never disclosed the Exclusive Agreement's existence to TIGI management, asserting: "Neither PPG nor Davis referenced the Agreement in written or oral conversations with other TIGI employees throughout Davis's tenure at TIGI or at any time after his departure until August 2017." *Id.* at 6. TIGI alleges "Davis and PPG backdated the Agreement nearly four years

to make it 'effective' . . . ." *Id.* at 5. Purportedly, Davis and PPG selected January 1, 2008 as an effective date "to provide a plausible explanation as to why TIGI management was not informed about its existence . . . ." *Id.*

PPG, on the other hand, claims that since 2008, PPG has continuously acted as an exclusive distributor and supplier of TIGI products, and the parties merely "memorialized" this agreement through the Exclusive Agreement. Dkt. 89 at 2–3. According to PPG, "In 2011, TIGI and PPG agreed that the Exclusive Agreement would have a retroactive effective date of January 1, 2008, to encompass the period that PPG had been operating as the exclusive supplier and distributor of TIGI Products in the U.S. Mass Retail Market." *Id.*

In August 2017, almost four years after Davis separated from TIGI, TIGI informed PPG of its decision to move to a direct distribution model. Dkt. 143 at 6. TIGI alleges "[a]t that time, and for the first time," PPG notified TIGI management of the Exclusive Agreement, and "PPG represented to TIGI that it had a valid and enforceable [exclusive distribution contract] dating back to January 1, 2008." *Id.*

On these facts, TIGI alleges PPG is liable for fraud, fraud by nondisclosure, aiding and abetting Davis' breach of his fiduciary duties, and entering into a civil conspiracy with Davis against TIGI. *Id.* at 12–16. TIGI seeks damages and declaratory judgment that the Exclusive Agreement is void due to fraud. *Id.* at 18. In the event TIGI is bound by the Exclusive Agreement, TIGI pleads, in the alternative, that PPG is liable for breach of contract, as PPG did not fulfill its obligation to "diligently" promote TIGI products as specified in the Exclusive Agreement. *See id.* at 16–18.[1]

PPG asserts counterclaims against TIGI, alleging TIGI "chronically" breached the

---

[1] These claims are asserted in TIGI's Second Amended Complaint (Dkt. 143), which is the live pleading in this matter.

Exclusive Agreement's express terms, breached the implied covenant of good faith and fair dealing, tortiously interfered with PPG's business relationships, and defrauded PPG. *See* Dkt. 89 at 4, 12–23.[2] PPG seeks damages and injunctive relief. *See id.* at 23.

After TIGI initiated this lawsuit, TIGI filed a separate lawsuit against Davis in Texas state court. *See TIGI Linea Corp. v. Davis*, Cause No. 471-03152-2020, Orig. Pet. (471st Dist. Ct., Collin County, Tex. June 29, 2020). In its state court lawsuit, TIGI alleged Davis formed a conspiracy against TIGI, breached his fiduciary duties of loyalty and disclosure owed to TIGI, and defrauded TIGI by entering into the Exclusive Agreement on behalf of TIGI and failing to disclose the arrangement to TIGI. *See id.* at 8–10. On or about August 26, 2020, TIGI and Davis executed a confidential settlement agreement (the "Settlement Agreement"), which resolved the litigation in Texas state court. *See* Dkt. 160 at 1.

In February 2021, TIGI and PPG notified the Court of multiple discovery disputes regarding this lawsuit. *See* Dkt. 153. The Court then ordered the parties to file letter briefs on an expedited schedule and heard oral argument from the parties. *See* Dkts. 153, 179. Generally, at issue is (1) whether PPG can supplement the record with a letter from Davis, (2) whether TIGI must produce various documents requested by PPG, and (3) whether PPG must produce various documents requested by TIGI. *See* Dkts. 154, 155, 156, 157, 158, 159, 160, 162.

---

[2] This matter has a somewhat convoluted procedural history. TIGI's lawsuit was initiated against PPG in this Court, and the counterclaims enumerated above were filed in the same cause number. *See* No. 4:19-cv-840, Dkts. 1, 11, 89. PPG initiated a separate lawsuit against TIGI, which originated in Florida state court. *See Professional Prod. Grp., LLC v. TIGI Linea Corp.*, No. 4:20-cv-87, Dkt. 1 (E.D. Tex. Dec. 9, 2019) (explaining procedural history). PPG's lawsuit in Florida state court asserted similar causes of actions and factual allegations against TIGI. *Id.* TIGI then removed PPG's state court lawsuit to the Southern District of Florida, and the Southern District of Florida subsequently transferred PPG's lawsuit to this Court. *See* No. 4:20-cv-87, Dkts. 1, 39. The Court then consolidated PPG's case with TIGI's case. *See* No. 4:19-cv-840, Dkt. 34; No. 4:20-cv-87, Dkt. 53. To simplify its discussion, the Court's analysis is phrased in terms of TIGI's claims and PPG's counterclaims, as asserted in Civil Action Number 4:19-cv-840, and the Court omits discussion of PPG's claims in Civil Action Number 4:20-cv-87.

## II. <u>LEGAL STANDARD</u>

Under Federal Rule of Civil Procedure 26(b), "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ." FED. R. CIV. P. 26(b)(1). "Under Rule 26(b)(1), discoverable matter must be both relevant and proportional to the needs of the case—which are related but distinct requirements." *Samsung Elecs. Am., Inc. v. Chung*, 321 F.R.D. 250, 279 (N.D. Tex. 2017). Relevance "encompass[es] any matter that bears on, or that could reasonably lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978). "To be relevant under Rule 26(b)(1), a document or information need not, by itself, prove or disprove a claim or defense or have strong probative force or value. If it were otherwise, it would make little sense for Rule 26(b)(1) to direct courts to consider whether discovery that is relevant to any party's claim or defense is also important in resolving the issues." *Samsung*, 321 F.R.D. at 280. Proportionality is determined by "considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." FED. R. CIV. P. 26(b)(1); *see also* RICHARD L. MARCUS, FEDERAL PRACTICE AND PROCEDURE § 2008.1 (3d ed.) (April 2021 update).

Thus, the primary inquiries in discovery disputes are relevance and proportionality, *not* admissibility. *See Young v. Braum's, Inc.*, Nos. 5:19-cv-161, 5:20-cv-178, 5:20-cv-179, 2021 WL 1413128, at *10 (E.D. Tex. Jan. 8, 2021); *Kreger v. General Steel Corp.*, No. 07-575, 2008 WL 782767, at *2 (E.D. La. Mar. 20, 2008) ("[I]ssues of discoverability under Rule 26 are separate and distinct from issues of admissibility at trial."). The district court is afforded broad discretion

when deciding discovery matters. *See Crosby v. Louisiana Health Serv. & Indem. Co.*, 647 F.3d 258, 261 (5th Cir. 2011).

### III.  ANALYSIS

Below, the Court first addresses PPG's Motion to Supplement (Dkt. 160), followed by PPG's Motion to Compel (Dkt. 154) and TIGI's Motion to Compel (Dkt. 155).

### A.  PPG'S MOTION TO SUPPLEMENT

PPG's Motion to Supplement asks the Court to supplement the record with a letter from Davis (the "Letter of Consent") (Dkt. 160-1). *See* Dkt. 160. In the Letter of Consent, Davis states he does not object to TIGI producing the confidential Settlement Agreement to PPG. *See* Dkt. 160-1. TIGI opposes having the Letter of Consent supplement the record, arguing the Motion to Supplement is untimely and the Motion to Supplement is not justified by any citation to legal authority. *See* Dkt. 162. TIGI further argues the Letter of Consent is irrelevant, as it does not affect the Court's legal analysis as to whether the Settlement Agreement should be produced because Davis cannot unilaterally waive confidentiality of the Settlement Agreement. *See id.*

"The Court has discretion to grant or deny a motion to supplement the record." *United States ex rel. Colquitt v. Abbott Labs.*, No. 3:06-cv-1769-M, 2015 WL 13670916, at *7 (N.D. Tex. July 24, 2015). Here, in exercise of its discretion, the Court grants PPG's Motion to Supplement. To be sure, the Motion to Supplement lacks citations to legal authority; the Letter of Consent does not affect the Court's legal analysis on whether the Settlement Agreement should be produced; and Davis cannot unilaterally waive the confidentiality provisions contained in the Settlement Agreement. Nevertheless, the Court finds the Letter of Consent helpful, as it confirms for the record that Davis does not oppose PPG's inspection of the Settlement Agreement. Accordingly, the Court grants the Motion to Supplement, and the Letter of Consent shall be a part of the record.

### B. PPG'S MOTION TO COMPEL

At issue is whether (1) TIGI must produce certain sales information to PPG, and (2) whether TIGI must produce the confidential Settlement Agreement executed between TIGI and Davis in *TIGI Linea Corp. v. Davis*, Cause No. 471-03152-2020. *See* Dkts. 154, 156, 159.

#### 1. Whether TIGI Must Produce Sales Data to PPG

On November 20, 2020, PPG served its Fourth Request for Production on TIGI, wherein PPG seeks:

> ESI from TIGI's sales transaction database(s) (*e.g.*, Oracle, SAP, or other) in Microsoft Excel export or .CSV (native) format with all complete, detailed sales information for all direct or indirect sales of TIGI Products to the North American Retail Market since January 1, 2008 to the present as maintained in the ordinary course of TIGI's business, including but not limited to the following associated information:
>
>     a. Order Number;
>     b. Order Date;
>     c. Customer;
>     d. Ship to Customer;
>     e. Ship Date;
>     f. Ship to Address;
>     g. Product or Item Description(s);
>     h. Product Size(s);
>     i. Product Stock Keeping Unit(s) (SKU);
>     j. Quantities;
>     k. Price Information;
>     l. Salespersons; and
>     m. Payment Terms.

Dkt. 154-1 at 9, 16 (punctuation added).

TIGI describes this request as "a harassing attempt to force TIGI to provide even more irrelevant and duplicative information" and "blatantly overbroad and hopelessly vague." Dkt. 156 at 1–2. TIGI also contends PPG's request requires TIGI "to create information that does not exist in the ordinary course of TIGI's business," which would be "particularly troublesome given TIGI has already produced responsive information, rendering this Request cumulative and duplicative."

*Id.* at 2. The Court addresses relevance and proportionality—the lodestar of a Rule 26(b) analysis—in turn.

### a. Relevance

PPG's request clearly encompasses documents relevant to PPG's counterclaims. The Exclusive Agreement grants PPG "an exclusive right to sell TIGI Products to distributors and wholesalers" in the "North American Mass Retail Market." Dkt. 89-1 at 3. PPG alleges TIGI breached this provision by selling TIGI products directly to retailers and intermediary distributors without PPG's prior written approval. *See* Dkt. 89 at 13. To determine whether TIGI is, in fact, in breach of the Exclusive Agreement, it is necessary for PPG to obtain information regarding direct and indirect sales of TIGI products throughout the North American Mass Retail Market, as such information bears on PPG's ability to prove or disprove its counterclaims. *See Wrangen v. Pennsylvania Lumbermans Mut. Ins. Co.*, 593 F. Supp. 2d 1273, 1278 (S.D. Fla. 2008) ("[D]iscovery should ordinarily be allowed under the concept of relevancy unless it is clear that the information sought has no possible bearing on the claims and defenses of the parties or otherwise on the subject matter of the action.") (citations omitted). Thus, the Court rejects TIGI's contention that PPG's request seeks irrelevant materials.

### b. Proportionality

Though the request seeks relevant documents, the Court agrees with TIGI's contention that producing all sales data falling under the umbrella of "North American Retail Market" is not proportional to the needs of the case. The Exclusive Agreement grants PPG exclusive distribution rights in the "North American *Mass* Retail Market," not the general "North American Retail Market." Dkt. 89-1 at 3 (emphasis added). At the Hearing, PPG's counsel agreed the request should reflect the language and definition as articulated in the Exclusive Agreement. *See* Dkt. 179. Thus,

the Court finds PPG's request should be narrowed accordingly, and PPG is entitled to obtain non-privileged documents relating to the "North American Mass Retail Market," as understood and defined in the Exclusive Agreement. *See* Dkt. 89-1 at 3.

The Court also agrees with TIGI's contention that the temporal scope of PPG's request is overly broad. *See* Dkt. 179. PPG argues it is entitled to sales data from January 1, 2008 to present, as the Exclusive Agreement's text states the Exclusive Agreement was effective as of January 1, 2008. *See* Dkt. 154 at 2; Dkt. 179. TIGI contends August 2017 to present should be the applicable timespan, as August 2017 is when TIGI allegedly became aware of the Exclusive Agreement. *See* Dkt. 143 at 5; Dkt. 179. At the Hearing, the parties reached an agreement that documents from October 1, 2011 to present was a reasonable time period, as October 1, 2011 is near the date the Exclusive Agreement was actually signed by Davis and PPG. *See* Dkt. 179. Given the parties' agreement, the Court finds TIGI need only produce responsive documents from October 1, 2011 to present.

As to the remainder of TIGI's contentions—that the information sought is duplicative and compliance would require producing information not generated in the ordinary course of business—the Court finds them unpersuasive. *See* Dkt. 156 at 1–2. The Court addresses these points in turn.

TIGI argues it already provided sales data for the North American Mass Retail Market by responding to an interrogatory previously propounded by PPG, and hence, PPG's Request for Production seeks duplicative information. *See* Dkt. 156 at 1. Having reviewed the interrogatory at issue, the Court finds TIGI's argument unavailing. PPG's interrogatory sought the total dollar amount of TIGI products sold directly to twenty-seven specified entities, such as Ross Dress for Less, Burlington, TJ Maxx, Marshalls, and Target. *See* Dkt. 156-1 at 10–11. While the "total dollar

amount" of direct sales to specified entities is certainly responsive to the Fourth Request for Production, such information comprises only a small subset of the information sought in the Fourth Request for Production. The Fourth Request for Production seeks information regarding both direct and indirect sales, customer information beyond the twenty-seven entities identified in the interrogatory, and information beyond "total dollar amounts," such as individual transaction data including, but not limited to, customer, product, pricing, and shipment information. *See* Dkt. 154-1 at 9. Because PPG's Fourth Request for Production is much broader in scope, it follows that PPG does not seek duplicative information.

Additionally, the Court does not find the production of the requested information unduly burdensome. "A party resisting discovery must show how the requested discovery is overly broad, unduly burdensome, or oppressive by submitting affidavits or offering evidence revealing the nature of the burden." *Samsung*, 321 F.R.D. at 283 (citations omitted). "Summary objections are rejected because broad-based, non-specific objections are almost impossible to assess on their merits, and fall woefully short of the burden that must be borne by a party making an objection to an interrogatory of document request." *Young*, 2021 WL 1413128, at *7 (cleaned up). The failure to submit affidavits or other evidentiary proof, "as a general matter, makes such an unsupported objection nothing more than unsustainable boilerplate." *Heller v. City of Dallas*, 303 F.R.D. 466, 490 (N.D. Tex. 2014).

Here, TIGI has submitted no affidavits or otherwise illuminating information to show the burdensome nature of producing these materials. TIGI has left the Court with no indication of how much money it would cost for TIGI to comply with PPG's request, how many employees would be required to work on this production request, how much time production would consume, or the volume of the information through which TIGI would be required to wade. *See Crownover v.*

*Crownover*, No. 2:15-cv-132-AM-CW, 2017 WL 10575859, at *2 (W.D. Tex. July 12, 2017) (granting motion to compel because request for six years of financial statements was not "problematic," given the entity did not engage in significant amounts of business); *Taylor v. Rothstein Kass & Co., PLLC*, No. 3:19-cv-1594-D, 2020 WL 7321174, at *3 (N.D. Tex. Dec. 11, 2020) (granting motion to compel because resisting party only needed to produce communications involving 130 investor claimants, rather than all 1,300 investors); *Dortch v. Wells Fargo Bank, NA*, No. 4:18-cv-452-ALM, 2020 WL 1289431, at *5 (E.D. Tex. Mar. 18, 2020) (denying motion to compel because request was not specific and applied to "a litany" of irrelevant documents); *Latham v. Polaris Indus., Inc.*, No. 3:15-cv-1209-B, 2016 WL 7395346, at *4–5 (N.D. Tex. May 16, 2016) (denying motion to compel because producing party had already spent approximately 150 person-hours complying with request, and such calculations did not include time spent by outside legal counsel on document production or out-of-pocket costs for copying, scanning, or shipping documents).

Here, TIGI argues producing information containing thirteen specific categories of information regarding sales information is overly burdensome. *See* Dkt. 156 at 2. To the contrary, the record demonstrates production would be relatively easy. PPG's Fourth Request for Production asks *only* for sales information created in the ordinary course of business, and as such, TIGI's argument that it must generate materials outside of its usual practice is an inaccurate characterization of PPG's request. *See* Dkt. 154-1 at 9; *see also Hoffman v. AmericaHomeKey Inc.*, No. 3:12-cv-3806-B-BK, 2015 WL 12698388, at *1 (N.D. Tex. June 24, 2015) ("[T]he Court cannot compel production of documents that do not exist[.]") (citations omitted). Additionally, the deposition testimony from a TIGI employee reflects that TIGI maintains sales information in an Oracle database, and TIGI employees routinely retrieve the requested information:

A: I may have pulled sales back on some best sellers to see if we could identify any trends, but I don't recall. I pulled sales quite frequently for various reasons.

Q: Well, what are some of the reasons you'd pull sales?

A: I would pull sales to make sure that customers were meeting forecast requirements. I would pull sales to make sure that we were on track or on trend for sales objectives. I would pull sales because somebody—one of the salespeople asked me, hey, you know, do you remember what my customer bought this month last year or various reasons to pull sales.

Q: When you say pull sales, you mean pull sales information to review?

A: Pulled orders out of Oracle to take a look at them.

Q: Okay. When you say pull sales, you don't mean like stop sales?

A: Oh, no, no. Pull—pull the information out of Oracle so that I could take a look at the sales.

*See* Dkt. 154-2 at 7. This testimony belies TIGI's argument that compliance would be unduly burdensome.

For the foregoing reasons, PPB's Motion to Compel (Dkt. 154) is **GRANTED IN PART** and **DENIED IN PART**. TIGI shall produce the sales data as follows: "Electronically Stored Information for all direct and indirect sales of TIGI Products to the North American Mass Retail Market since October 1, 2011, to the present, as maintained in the ordinary course of TIGI's business." Such information shall include, but is not limited to, the thirteen categories enumerated in the Fourth Request for Production (i.e., order number, order date, customer, etc.). *See* Dkt. 154-1 at 9. These materials are clearly relevant to PPG's counterclaims and their production is proportional to the needs of this case.

### 2. Whether TIGI Must Produce its Settlement Agreement with Davis

In its Fourth Request for Production, PPG seeks "Any settlement agreement or contract entered into on or about August 26, 2020 by and between TIGI and Vincent A. Davis to resolve

*TIGI Linea Corp. v. Vincent A. Davis*, Cause No. 471-03152-2020 in the District Court of Collin County, Texas." Dkt. 154-1 at 10. PPG argues the Settlement Agreement between Davis and TIGI is relevant, as it bears on the issues of comparative or proportionate fault, responsibility/contribution and release, and Davis's agency relationship with TIGI. *See* Dkt. 154 at 3; Dkt. 159 at 3. PPG also highlights the Settlement Agreement's contents could bear on how PPG approaches any direct or cross examination of Davis and other TIGI witnesses. *See* Dkt. 159 at 3.

In response, TIGI argues the 2020 Settlement Agreement is not relevant to any of PPG's claims or defenses. *See* Dkt. 156 at 2. TIGI further contends public policy supports the protection of confidential settlement materials. *See id.* at 3. At the Hearing, the Court ordered TIGI to produce the Settlement Agreement for *in camera* review, which TIGI timely submitted. *See* Dkt. 179. Because TIGI does not advance any argument regarding proportionality, the Court limits its discussion to (a) whether confidential settlement agreements are discoverable as a matter of law and (b) whether the Settlement Agreement is relevant within the meaning of Rule 26(b).

### a. Discoverability of confidential settlement agreements

Among the federal courts, there is a general consensus that confidential settlement agreements are discoverable. *See, e.g.*, *Hoffman*, 2015 WL 12698388, at *1 ("[T]he scope of allowable discovery is broad and includes the discovery of settlement agreements without regard to confidentiality provisions."). Accordingly, federal courts regularly order the production of settlement agreements, so long as such agreements are relevant within the meaning of Rule 26(b). *See Bennet v. La Pere*, 112 F.R.D. 136, 138–39, 141 (D.R.I. 1986) (ordering disclosure where settlement agreement was relevant to amount of damages recoverable and the viability of joining a potential third-party defendant); *Atchison Casting Corp. v. Marsh, Inc.*, 216 F.R.D. 225, 226–27

(2003) (ordering disclosure where settlement agreement in separate lawsuit concerned same underlying facts as pending lawsuit); *Cleveland Constr., Inc. v. Whitehouse Hotel Ltd. P'ship*, No. 01-2666, 2004 WL 385052, at *1 (E.D. La. Feb. 25, 2004) (ordering disclosure where settlement agreement was relevant to credibility of witnesses); *Allergan, Inc. v. Teva Pharm. USA, Inc.*, No. 2:15-cv-1455-WCB, 2017 WL 132265, at *1 (E.D. Tex. Jan. 12, 2017) (finding settlement agreements "are frequently the subjects of discovery requests, including in patent cases," and are "frequently" produced, so long as they are relevant to an issue such as damages, the availability of injunctive relief, patent misuse, and non-obviousness in patent cases). Courts have justified such disclosures under Rule 26(b) because relevance is an "elastic concept," "[m]utual knowledge of all the relevant facts gathered by both parties is essential to proper litigation," and "[f]airness cannot be achieved when one side is needlessly blindfolded." *Bennet*, 112 F.R.D. at 138, 141 (citing *Hickman v. Taylor*, 329 U.S. 495, 507 (1947)).

Resisting parties often argue the production of settlement agreements undermines the public policy goals of Federal Rule of Evidence 408, which, to encourage settlement, prohibits admitting compromise offers and negotiations into evidence. *See e.g.*, *id.* at 139. However, courts have dismissed such arguments, as "[n]o discouragement attends discoverability [of] completed compromises. From the point of view of the settling parties, the deal is done." *Id.* at 140. Courts also reason that confidential materials are not subject to an absolute privilege during discovery. *See In re Motions to Quash Subpoena filed by Craft Gallery*, Nos. W-13-MC-081, 11-cv-01239 AW, 2013 WL 8367788, at *1 (W.D. Tex. Apr. 5, 2013). "[L]itigants cannot shield a settlement agreement from discovery merely because it contains a confidentiality provision, or was filed under seal . . . ." *Sanchez v. Dow, Inc.*, No. 7:19-cv-341, 2020 WL 6365525, at *3 (S.D. Tex. Apr. 13, 2020) (quoting *Cleveland Constr.*, 2004 WL 385052, at *1); *Cooley v. Curves Int'l, Inc.*, No.

A-08-MC-108 LY, 2008 WL 11333881, at *4 (W.D. Tex. May 19, 2008) (stating the same).

While federal courts routinely find settlement agreements discoverable if they are relevant to the litigation, a more ambiguous legal question is whether settlement *negotiations*—communications leading to the execution of an agreement, or result in no agreement—are discoverable. *See Software Tree, LLC v. Red Hat, Inc.*, No. 6:09-cv-97, 2010 WL 2788202, at *1 (E.D. Tex. June 24, 2010) ("[T]he Eastern District of Texas has historically followed a bright-line rule protecting settlement negotiations from discovery."); *Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 332 F.3d 976, 980–82 (6th Cir. 2003) (recognizing a federal privilege for settlement negotiations); *SEC v. Thrasher*, No. 92 CIV. 6987, 1996 WL 94533, at *2 (S.D.N.Y. Feb. 27, 1996) (stating courts have applied a modest presumption against disclosing settlement negotiations). *But see ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860 (Fed. Cir. 2010) (suggesting underlying settlement negotiations are relevant to the calculation of reasonable royalty calculations in patent cases); *Tyco Healthcare Grp. LP v. E-Z EM, Inc.*, No. 2:07-cv-262 (TJW), 2010 WL 774878, at *2 (E.D. Tex. Mar. 2, 2010) (ordering disclosure of settlement negotiations in light of *ResQNet*).

Here, PPG seeks the production of the Settlement Agreement, not the production of settlement negotiations between Davis and TIGI. Dkt. 154-1 at 10. Because courts, including courts in this District, routinely order the production of confidential settlement agreements, *see, e.g.*, *Allergan*, 2017 WL 132265, at *1, the Court need not wade into the murkier subject of whether settlement negotiations are discoverable.

b.   *Relevance*

Having considered PPG's arguments and having reviewed the Settlement Agreement *in camera*, the Court finds the Settlement Agreement is relevant to the litigation, and is therefore

discoverable. The Settlement Agreement and its underlying state court litigation involves the same set of operative facts as this federal lawsuit. *Compare* Dkt. 143 *with TIGI Linea Corp. v. Davis*, No. 471-03152-2020, Orig. Pet. (471st Dist. Ct., Collin County, Tex. June 29, 2020). Davis' involvement in this matter is clearly relevant to TIGI's claim that PPG aided and abetted Davis in breaching his fiduciary duties and that PPG entered into a conspiracy with Davis. *See* Dkt. 143 at 15–15. Accordingly, the Settlement Agreement bears on PPG's ability to mount a defense against TIGI's claims, and thus, is discoverable. *See Bennett*, 112 F.R.D. at 140 (ordering disclosure of settlement agreement because "[p]retrial discovery was meant to end the sporting theory of justice. Its purpose was—and remains—to allow a wide search for facts which may aid a party in the attempt to ready the prosecution or defense of a claim."). Additionally, the Settlement Agreement may assist PPG with "ferreting out any cause for bias or prejudice" in Davis' potential testimony, which underscores its relevance to this lawsuit. *Kaplan Co., Inc. v. Peoplesoft USA, Inc.*, No. 1:03-CV-10142006, 2006 WL 8447846, at *3 (M.D.N.C. Mar. 15, 2006).

Furthermore, the Court highlights that Davis has consented to the production of the Settlement Agreement to PPG. *See* Dkt. 160-1. While not decisive, as Davis cannot waive TIGI's interest in maintaining the confidentiality of the Settlement Agreement, Davis' Letter of Consent dispels any concern the Court has regarding negatively impacting Davis' non-party interest in maintaining confidentiality. Finally, the Court notes it previously entered a Protective Order in this case, *see* Dkt. 57, which mitigates any harms TIGI and Davis may experience from disclosure in this lawsuit.

For the foregoing reasons, PPG's Motion to Compel (Dkt. 154) is **GRANTED** as to PPG's request for the Settlement Agreement.

### C. TIGI'S MOTION TO COMPEL

At issue are TIGI's requests for (1) PPG's promotional materials for products in competition with TIGI's "Bed Head 4 Men" ("BH4M") product line, (2) contracts and agreements between PPG and other entities for supplying products in competition with TIGI's products, (3) documents identified on PPG's privilege log as documents PPG-PRIV001589 to PPG-PRIV001606 ("Document Set 1"), and (4) documents identified on PPG's privilege log as documents PPG-PRIV001005 to PPG-PRIV1007 (the "Document Set 2"). *See* Dkt. 155 at 3; Dkt. 155-2 at 10, 12; Dkt. 158-1.

#### 1. Whether PPG Must Produce Customer Materials or Promotional Materials Concerning American Crew

TIGI's Second Request for Production seeks:

> All Documents and Communications related to customer presentations or promotional materials related to any Competitor Product of BH4M products, including without limitation American Crew brand products, provided by PPG to any actual or prospective customer.

Dkt. 155-2 at 10. Though the request seeks materials "without limitation" to American Crew brand products, TIGI's letter brief explains TIGI subsequently narrowed its request, seeking only promotional materials concerning American Crew. *See* Dkt. 155 at 2.

TIGI's lawsuit primarily argues the Exclusive Agreement is void and unenforceable. *See* Dkt. 143 at 18. However, if the Exclusive Agreement is an enforceable contract, TIGI alleges PPG breached its obligation to diligently promote TIGI products as specified in the Exclusive Agreement. *See id.* at 16–18. The parties represent PPG has already produced certain promotional materials relating to BH4M. *See* Dkt. 157 at 2; Dkt. 158 at 1. PPG argues the additional materials sought by TIGI are irrelevant, *see* Dkt. 157 at 1–2, and the Court agrees.

It is undisputed that the Exclusive Agreement does not prohibit PPG from promoting

products that are competitive with TIGI products. Indeed, TIGI's Second Amended Complaint demonstrates TIGI has always known PPG promoted products that were competitive to TIGI's: "PPG is a distributor and wholesaler of such kinds of products for TIGI, for *competitors* of TIGI, and others." Dkt. 143 at 2 (emphasis added). Because promoting American Crew products does not violate the Exclusive Agreement, these materials have no bearing on TIGI's ability to prove its breach of contract claim. Accordingly, the requested materials are irrelevant, and hence, are not discoverable. TIGI's Motion to Compel (Dkt. 155) is **DENIED** as to this request.

### 2. Whether PPG Must Produce Contracts and Agreements Concerning Competitors' Products

TIGI's Second Request for Production also seeks:

> Any contract or agreement between PPG or any PPG Affiliate and any actual or potential customers for supply of Competitor Products, including but not limited to Sexy Hair, American Crew, Sebastian, and It's a 10, effective at any time from January 1, 2008 to the present.

Dkt. 155-2 at 12.

Again, supplying products in competition with TIGI products does not violate the Exclusive Agreement, as the Exclusive Agreement does not prohibit PPG from distributing competitors' products. *See supra* Section III.C.1. Therefore, the request for "*any* contract or agreement . . . for supply of Competitor Products" seeks irrelevant documents.

However, the Court recognizes a more narrowly tailored request could lead to the production of documents relevant to TIGI's breach of contract claim. Thus, TIGI may obtain agreements, or terms of agreements, that impose a limit to PPG's ability to promote competitor products in relation to TIGI's products. That is, TIGI may seek contracts and agreements that demonstrate PPG was compelled to promote competitor products over TIGI products, should such materials exist.

To the extent PPG argues these materials constitute undiscoverable "trade secrets," the Court finds PPG's argument unavailing. "No absolute privilege for confidential information or trade secrets exists." *Cmedia, LLC v. LifeKey Healthcare, LLC*, 216 F.R.D. 387, 390 (N.D. Tex. 2003). The party resisting disclosure must first establish that the information sought constitutes trade secrets and disclosure of the trade secrets might be harmful. *See Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 131 F.R.D. 668, 671 (S.D. Tex. 1990). Once the resisting party meets this initial burden, the burden then shifts to the party seeking discovery to establish disclosure is relevant and necessary to the action. *Id.* The district court then balances the need for trade secrets against the claim of injury resulting from disclosure. *Id.*

PPG cites no authority to establish its agreements with competitors constitute trade secrets. Under Texas law, "[a] trade secret is any formula, pattern, device, or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996). Trade secrets differ "from other secret information in a business in that it is not simply information as to single or ephemeral events in the conduct of the business. . . . A trade secret is a process or device for continuous use in the operation of the business." *CQ, Inc. v. TXU Mining Co., LP*, 565 F.3d 268, 273 (5th Cir. 2009) (quoting Restatement (First) of Torts § 757 cmt. b) (Am. L. Inst. 1939)). Without any elaborated argument as to why these agreements constitute trade secrets, or contain trade secrets, PPG has not carried its burden.

Moreover, federal courts regularly order parties to produce agreements made with competitors. *See, e.g.*, *Public Health Equip. & Supply Co. v. Clarke Mosquito Control Prods., Inc.*, No. SA-08-cv-0895 OG (NN), 2011 WL 2470059, at *2 (W.D. Tex. June 16, 2011); *Cook, Inc. v. Boston Scientific Corp.*, No. 01 C 9479, 2002 WL 406977, at *4 (N.D. Ill. Mar. 15, 2002).

Even if the Court assumed competitor contracts constitute trade secrets that would be harmful if disclosed, the Court finds disclosure relevant and necessary to TIGI's claim that PPG failed to diligently promote its products. The Court also notes it has entered a Protective Order in this matter, which allows the parties to limit documents exchanged to attorney's eyes only if certain requirements are satisfied. *See* Dkt. 57.

TIGI's Motion to Compel (Dkt. 155) is, thus, **GRANTED IN PART** and **DENIED IN PART**, and PPG shall produce agreements requiring PPG to promote competitive products over TIGI's, or limit the promotion of TIGI's products.

### 3. Whether PPG Must Produce Document Set 1

Document Set 1 comprises four documents, which PPG's privilege log describes as:

1. Email chain 10/24/19 – 10/251/9 between L. Adelson, Esq., **F. Heuser**, L. Samuels, Esq. re: Engagement Letter;

2. Email chain 10/24/19 – 10/25/19 between L. Adelson, Esq., R. Villoldo, L. Samuels, Esq., re: Third Party payer engagement letter – **Heuser. Jacavi Beauty**;

3. Email chain 10/24/19 – 10/25/19 between L. Adelson, Esq., R. Villoldo, L. Samuels, Esq. V. Barthelemy re: Third Party payer engagement letter – **Heuser. Jacavi Beauty**; and

4. Email chain 10/24/19 – 10/25/19 between L. Adelson, Esq., **F. Heuser**, L. Samuels, Esq. re: Engagement Letter.

Dkt. 158-1 at 3–4 (emphasis added).

Jacavi Beauty is an affiliate of PPG. *See* Dkt. 157 at 3 n.6. Frank Heuser ("Heuser") is a former employee of TIGI's global marketing strategy group who currently owns and operates AAF Projects, LLC, a consulting company providing services to PPG. *See* Dkt. 155 at 2–3; Dkt. 155-3 at 3; Dkt. 155-6 at 5; Dkt. 155-10 at 5; Dkt. 157 at 3 n.6. Though PPG's letter brief argues the "common interest privilege" protects Document Set 1, at the Hearing, PPG conceded Document

Set 1 was not privileged and, instead, argued Document Set 1 is not relevant to any of TIGI's claims or defenses. *See* Dkt. 157 at 3; Dkt. 179.

PPG's relevance objection is unpersuasive. In its Second Amended Complaint, TIGI alleges Davis "solicit[ed] the departure of other employees while still working for TIGI" in breach of Davis' fiduciary duties, and PPG allegedly aided and abetted Davis in this breach. *See* Dkt. 143 at 15. Heuser, as a former TIGI employee who now provides consulting services to PPG and its affiliate, may be a key fact witness regarding TIGI's aiding and abetting claim. Moreover, should Heuser testify in support of PPG, Document Set 1 may establish bias in Heuser's testimony. *See* Dkt. 158 at 3. Indeed, during the Court's hearing on PPG's motion for a preliminary injunction, Heuser testified that after leaving TIGI, all of his income as of April 2020 has come from PPG. *See* Dkt. 158-3 at 3. Because communications between PPG and Heuser are not privileged and are plainly relevant to the issues in this lawsuit, TIGI's Motion to Compel (Dkt. 155) is **GRANTED** as to Document Set 1, and PPG shall produce Document Set 1.

### 4. Whether PPG Must Produce Document Set 2

Document Set 2 comprises two documents, which PPG's privilege log describes as:

1. Email from L. Samuels, Esq. to L. Adelson, Esq., V. Barthelemy, A. Miyar, Esq., R. Gonzalez, Esq., R. Martinez re: Declaration of Frank Heuser; and

2. "Attachment to email above."

Dkt. 158-1 at 2.

PPG describes these materials as communications exchanged between PPG's counsel and Heuser's counsel. *See* Dkt. 157 at 3. Other than this sparse information, the Court cannot discern the nature of these communications. At issue is whether the Court should apply Texas or Florida law and whether these states' "common interest privilege," also known as the "joint defense privilege," protects Document Set 2. *See* Dkts. 158, 157. At the Hearing, the parties agreed the

choice of law issue is not yet ripe for the Court, as additional discovery is needed before the parties are prepared to make their arguments on this issue. *See* Dkt. 179. However, as explained below, regardless of whether Texas or Florida law applies, Document Set 2 is not protected by either state's common interest privilege.

Both Texas and Florida recognize a common interest privilege, which stems from the attorney-client privilege. *See In re Santa Fe Int'l Corp.*, 272 F.3d 705, 710 (5th Cir. 2001); *Guarantee Ins. Co. v. Heffernan Ins. Brokers, Inc.*, 300 F.R.D. 590, 596 (S.D. Fla. 2014). Generally, the attorney-client privilege protects confidential communications made between a client and an attorney for the purpose of obtaining legal advice. *See Hodges, Grant & Kaufmann v. United States*, 768 F.2d 719, 721 (5th Cir. 1985); *United States v. Patel*, — F. Supp. 3d —, No. 119-cr-80181-Ruiz/Reinhart, 2020 WL 7973941, at *3 (S.D. Fla. 2020). Because the attorney-client privilege protects only *confidential* communications, the presence of a third party while such communications are made, or the disclosure of an otherwise privileged communication to a third person, "eliminates the intent for confidentiality on which the privilege rests." *Hodges*, 768 F.2d at 421; *see also Visual Scene, Inc. v. Pilkington Bros.*, 508 So.2d 437, 440 (Fla. Dist. Ct. App. 1987). "The privilege is not, however, waived if a privileged communication is shared with a third person who has a common legal interest with respect to the subject matter of the communication." *Hodges*, 768 F.2d at 421; *see also United States v. Almeida*, 341 F.3d 1318, 1324–25 (11th Cir. 2003).

Under Texas law, two types of communications are protected by the common interest privilege: (1) communications between co-defendants in actual litigation and their counsel; and (2) communications between potential co-defendants and their counsel. *See In re Santa Fe*, 727 F.3d at 710.

Under Florida law, the privilege is broader: "[T]here are three threshold questions to determine whether [the common interest privilege] should apply: (1) whether the original disclosures were necessary to obtain informed legal advice and might not have been made absent the attorney-client privilege; (2) whether the communication was such that disclosure to third parties was not intended; and (3) whether the information was exchanged between the parties for the limited purpose of assisting in their common cause." *In re Int'l Oil Trading Co., LLC*, 548 B.R. 825, 833 (S.D. Fla. 2016) (citation omitted). The nature of the common interest must be legal, not solely commercial, and determining whether a common legal interest exists is a fact-specific inquiry. *Spencer v. Taco Bell Corp.*, No. 8:12-cv-387-T-23TBM, 2013 WL 12156093, at *2 (M.D. Fla. Apr. 23, 2013); *Patel*, 2020 WL 7973941, at *2. "The cause need not be an identical legal cause, but rather a 'common, litigation-related cause.'" *In re Int'l Oil Trading*, 548 B.R. at 833 (quoting *Infinite Energy, Inc. v. Econnergy Energy Co.*, No. 1:06-cv-124-SPM/AK, 2008 WL 2856719, at *1 (N.D. Fla. July 23, 2008)).

Under both Texas and Florida law, the party asserting the applicability of the privilege bears the burden of establishing the privilege applies. *See Taylor Lohmeyer Law Firm PLLC v. United States*, 957 F.3d 505, 510 (5th Cir. 2020); *Milinazzo v. State Farm Ins. Co.*, 247 F.R.D. 691, 697 (S.D. Fla. 2007).

At the Hearing, PPG conceded that if Texas law applies, the common interest privilege does not protect Document Set 2. However, if Florida law applies, PPG argues Document Set 2 is protected by the privilege. *See* Dkt. 157 at 3.

Having reviewed PPG's privilege log and considered the arguments, PPG has not met its burden to show Document Set 2 is protected under Florida's common interest privilege. *See Milinazzo*, 247 F.R.D. at 697. The privilege log shows counsel for PPG and Heuser discussed a

declaration, and an attachment was exchanged. *See* Dkt. 158-1 at 2. PPG's letter brief merely recites the elements of the privilege, with no elaboration on what legal interest is shared between PPG and Heuser in this email communication. *See* Dkt. 157. PPG's arguments at the Hearing did not expand further. *See* Dkt. 179. PPG has therefore left the Court with nothing to consider other than language echoing standard rule statements announced in Florida case law. Accordingly, the Court is unequipped to conduct a fact-specific inquiry to determine whether the shared interest between Heuser and PPG is commercial or legal in nature. *See Companhia Energetica Potiguar v. Caterpillar, Inc.*, No. 14-cv-24277-Martinez/Goodman, 2015 WL 13779201, at *4 (S.D. Fla. Nov. 5, 2015) (finding shared legal interest existed where two parties received demand letter from potential plaintiff and two parties emailed to craft a response); *Spencer*, 2013 WL 12156093 at *3 (finding no shared legal interest existed where exchanges between counsel concerned drafts of a commercial agreement, which contained a single clause about allocating risks in litigation); *Patel*, 2020 WL 7973941, at *9 (finding no shared legal interest existed where company representative sent a compliance letter to an individual and instructed the individual to forward the compliance letter to industry contacts); *Breslow v. American Sec. Ins. Co.*, 2016 WL 698124, at *9–10 (S.D. Fla. Feb. 19, 2016) (finding no shared legal interest existed where two individuals exchanged emails about a third person and the third individual had not yet become a legal adversary). PPG has failed to carry its burden and, thus, the Court finds that the common interest privilege does not protect Document Set 2. Accordingly, TIGI's Motion to Compel (Dkt. 155) is **GRANTED** as to Document Set 2, and PPG shall produce Document Set 2.

# IV. CONCLUSION

For the foregoing reasons, the Court finds PPG's Motion to Supplement (Dkt. 160) is hereby **GRANTED**. PPG's Motion to Compel (Dkt. 154) is hereby **GRANTED IN PART** and **DENIED IN PART** as follows:

- PPG's Motion to Compel is **DENIED** as to its request for sales information concerning the "North American Retail Market."

- PPG's Motion to Compel is **DENIED** as to its request for sales information from January 1, 2008 to present.

- PPG's Motion to Compel is **GRANTED** as to its request for "Electronically Stored Information for all direct and indirect sales of TIGI Products to the North American Mass Retail Market since October 1, 2011, to the present, as maintained in the ordinary course of TIGI's business." Such information shall include, but is not limited to, the thirteen categories enumerated in the Fourth Request for Production (i.e., order number, order date, customer, etc.).

- PPG's Motion to Compel is **GRANTED** as to its request for any settlement agreement or contract entered on or about August 26, 2020 by and between TIGI and Vincent A. Davis to resolve *TIGI Linea Corp. v. Davis*, No. 471-03152-2020 (471st Dist. Ct., Collin County, Tex. June 29, 2020).

The Court further finds TIGI's Motion to Compel (Dkt. 155) is **GRANTED IN PART** and **DENIED IN PART** as follows:

- TIGI's Motion to Compel is **DENIED** as to its request for customer or promotional materials concerning American Crew products.

- TIGI's Motion to Compel is **DENIED** as to its request for any contract and agreement concerning products in competition with TIGI's.

- TIGI's Motion to Compel is **GRANTED** as to its request for all contracts and agreements that impose a limit on PPG's ability to promote TIGI products or require that PPG promote competitor products over TIGI's.

- TIGI's Motion to Compel is **GRANTED** as to its request for Document Set 1, identified in PPG's privilege log as documents PPG-PRIV001589 to PPG-PRIV001606.

- TIGI's Motion to Compel is **GRANTED** as to its request for Document Set 2, identified in PPG's privilege log as documents PPG-PRIV001005 to PPG-

PRIV1007.

The parties are **ORDERED** to comply with these directives for production on or before

fourteen (14) days from the issuance of this Memorandum Opinion and Order.

**So ORDERED and SIGNED this 14th day of May, 2021.**

_____
KIMBERLY C. PRIEST JOHNSON
UNITED STATES MAGISTRATE JUDGE